Catron, Ch. J.
Whether the act of limitations of 1819, ch. 28, sec. 2, operates in bar of a claim to land before an entry is made on the warrant, depends on the nature of the complainant’s title, and his right to sue in law or equity, to enforce his claim. Much confusion and not a little perplexity has prevailed among members of the legal profession, and with the courts of justice, in coming to a conclusion, what description of property a land warrant is; that it is a hereditament and descended to the heir, we have always holden; but from our habits of dealing for it as property, the land warrant has been thought, as disconnected from the land, and not as conferring a vested right to land on the owner, until located. In itself it has no value other than as evidence of title; in this respect it stands on the foot of other title papers. Is it evidence of a vested right to land in the holder? If so,then the land descends, and the evidence of title with it as an incident. This is manifestly the case, as will be seen when we look to the circumstances that gave rise to the land warrant.
An act of 1780, now lost, but referred to in the 7th *193 section of the act of 1782, ch. 3, promised a reward in land to the officers and soldiers of the continental line in the service of North Carolina. The act of 1782 provided that six .hundred and forty acres should be laid off to each soldier who had served to the end of the war, and to the officers in proportion to grade.
The act was a contract on the part of the State with the officer and soldier to pay them the land out of a certain district to be laid off by commissioners. Tatum, Shelby, and Bledsoe were appointed by the State of North Carolina, and the officers were to appoint one or more on behalf of the army. The district was laid off, and has since been extended to the Western District. The acts of 1783, ch. 3, and 1784, chs. 15 and 16, were designed to carry into effect the obligations imposed by that of 1782. The soldier paid for the land in services, and had a vested right in the military district, as tenant in common with the State and his fellow soldiers. Ivey vs. Pinson, 1 Yerg. 309, 324, 359.
The act of 1783, ch. 2, provided for selling the western lands out of the military district at ¿610 for each hundred acres. When the money was paid, of course the purchaser became a'tenant ip common with the State, and had a vested right to the land he had paid for. In this case the land purchased was described by an entry, but if that entered had been previously sold by the State, the enterer could go elsewhere. So in the soldier’s case. If he entered on lands previously appropriated, the surveyor could without another entry survey the claim on any vacant land. 1784, ch. 15, sec. 7.
By the act of 1783, it was necessary the soldier should serve to the end of the war. &c. to be entitled. As evidence that he had performed the duty, the warrant was issued to him. It was a title-bond on the State for the quantity of land called for. The State held as trustee. Nothing was wanted but partition to give the soldier the substance of his contract. See cession act, 1789, ch. 3, *194 second condition. The entry with the surveyor, the agent of both parties, effected the partition, but did not give title (this previously existed) more than if A sold B one hundred acres of a one thousand acre tract, to be selected by their mutual agent. Before the selection they were tenants in common; after, A held the naked legal title for B to the one hundred acres. The State stands on no different ground from an individual, (3 Cra. 70: 1 Yerger, 339,) and may in substance be decreed against. 1 Yerg. 309, 324.
Certain rules prescribing the mode of selection by entry and survey was necessary for the claimant to pursue to have his land set apart to him in severalty; if he pursued these requisites, the State could not resist; the courts would enforce the performance of the trust. We are in the daily practice of compelling the Secretary of State to issue warrants by mandamus; the surveyor to receive an entry to survey, or do any other prescribed duty. So we compel the register, secretary and govern- or, if need be, to issue the grant and vest the legal title. The idea of disobeying has never occurred to a public officer. The mode of communicating title is a matter of form and detail, to effectuate a pre-existing trust. The State of North Carolina might have made partition and surveyed off the lands of the soldiers without ever opening a land office, and confirmed the partition by act of assembly. The distinguished soldier and patriot, General Greene, was not of the North Carolina continental line; but with masterly ability as commanding general, he had wrested the Carolinas from the hands of the,enemy, in consideration of which distinguished services, North Carolina allotted for and gave him twenty-five thousand acres of land in the military district, to be laid off by the commissioners Tatum, Shelby, and Bledsoe. 1782, sec. 10. They caused it to be laid off. This grant has received the sanction of the courts of justice, and it is our pride and boast that it has drawn to us a part of *195 his family, and now furnishes an opulent home for his ac-comphshed daughter. 1 he act ot April, 1784, ch. 18, was only a recognition of the partition made by the commissioners, or rather by Gen. Robertson, on their behalf. The act of 1782 vested the title in common. Every officer and every soldier had in substance as good a right in common to the quantity promised him, when he had performed the stipulated service, as had Gen. Greene. The soldier’s vested right was equally clear. Thus stood the obligations of Carolina before the warrant issued. But it was an obligation resting upon the statutes of 1782, 1783 and’1784. The individuals actually entitled were not and could not be pointed out by the statutes. To ascertain this was the next step. North Carolina took upon herself to grant the officer, the soldier, or his heir or assignee. 1782, ch. 3: 1789, ch. 3. To ascertain the grantee, was a matter of paramount difficulty^. this right North Carolina has never lapse of time the difficulty increased^ ^*f819 she in-Ji stituted a commission consisting of the'jWiveapomtííf rer and comptroller, to issue the remnaHw-militafy war* rants to applicants that should be entitled. ^ By this board, the warrant for the land iKvcontroversy wa issued. '
In 1789, chapter 3, the western lands were by North Carolina ceded to the United States, but the right to satisfy the officers’ and soldiers’ claims was reserved unimpaired, and the exclusive right to issue military warrants. 1804, ch. 14, sec. 1. By the act of 1804 and 1806, ch. 10, Tennessee, as the agent of North Carolina, had conferred upon her the power to cause to be entered and granted, the lands due from North Carolina to her officers and soldiers. Every warrant issued by the officers of North Carolina was binding and conclusive evidence of title in the person to whom the warrant issued, so far as our officers dare determine. We had no authority to determine who had served. The muster *196 rolls, the record and best evidence of the fact, remained with North Carolina. That he in whose name the warrant issued, was entitled to the grant unless his title was set aside by a court of chancery has never been controverted, save in the instance of the University warrants before the legislature in 1822. The matter of law, whether Tennessee had any right to call in question the acts of North Carolina, in issuing the University warrants, was by the act of 1822, chapter 3, referred to commissioners. Jenkin Whiteside and James Trimble, esquires, were appointed to determine the legal question; and they adjudged that, “after investigating the title of said President and Trustees to said warrants, and having ascertained said warrants were issued by the Secretary of the State of North Carolina in pursuance of the right exclusively reserved by that State to herself in her compact with the State of Tennessee, to issue military warrants; and it appearing that many of said warrants have been located and entered, and surveys made thereon by the officers of the State of Tennessee, and many others of the same have been filed with the commissioners for adjudication under the provisions of the laws of this State, do adjudge and decide, and hereby direct, that grants shall issue by the State of Tennessee upon the entries and surveys which are and shall be made by virtue of said warrants to the trustees of the University of North Carolina, or to their assigns.”
These same commissioners, by virtue of their authority from our legislature, entered into a compact on behalf of the Slate of Tennessee, by which twenty thousand acres of these warrants were transferred to East Tennessee college; of which, warrant number 949, for 2,560 acres was part. This was done on the 5th of August 1822. Acts of 1822, ch. 49.
The correctness of the determination of Mr. White-side and Mr. Trimble, I have never known to be questioned.
*197 By her compacts with the United Stales, North Carolina reserved no power to issue two warrants for the same claim; nor in her compact with Tennessee did she reserve power to recall a warrant when once issued. The warrant as an obligation for title, merged all other evidence and was conclusive as against North Carolina and Tennessee. The title in this case to the land called for on the face of the warrant, was, by virtue thereof, vested in the University of North Carolina; and by her assignment of the 5th of August, 1822, in the Trustees of East Tennessee college: that the warrant gives title to the land ought not to admit of doubt. Without it the entry would be void and the grant likewise. It is the basis of the title. Truly, in courts of law the grant merges the enquiry for the warrant, because higher evidence. The courts refuse to go behind the grant; but where it becomes necessary to resort to the entry to overreach an older grant grounded on a younger entry, and the older entry is void for want of a warrant to ground it on, the title falls. The grant rests upon the presumption that ail the previous requisites of the law have been complied with. 9 Cra. 87, 94. But in a court of equity or on caveat, the presumption falls to the ground, if it be proved that the grantee had no incipient title by a warrant to the land granted. In the cause of Polk vs. Wendell, (9 Cra. 87: 5 Wheat. 293) it was holden by the supreme court of the United States, the plaintiff could at law go behind the defendant’s grant and show it wanted the basis of a warrant. How far this enquiry may be made at law in the action of ejectment, it is useless to enquire. The doctrine will be seen in 2 Ten. Rep. 118 to 157, and 433.
The question here is, did the University of North Carolina acquire an incipient title to the land entered and granted by obtaining the warrant? That she did is clear. How could the complainant Neal divest this title? By a bill in equity by which he could cause the warrant before entered to be assigned to him. The assignment op *198 erated as a transfer of the equity in the land to the East Tennessee College, and if made by order of a court of equity to complainant, would have transferred the equity to him. The assignment of a warrant is the conveyance of the land to which the warrant gives title. It matters nothing in principle whether the land be set apart by entry or grant. This was an easy matter for him who had a vested title by the warrant. The right of action at law for damages, or in equity to have the warrant assignedto him, was as perfect in complainant against the East Tennessee college before the warrant was located as after-wards; and the effect of the decree would have been in substance the same.
That the University, by obtaining the warrant in her own name, took a title to complainant’s land, destructive to the title existing before the warrant issued, is the basis of the decree in the cause of Ann Cambreling against the University, decided this term. What is the injury a court of equity is called upon to redress by decree in this case? The complainant informs us that his brother Lieut. Neal fell in battle during the revolutionary war, and being of the continental line of North Carolina, was entitled by the act of 1782 to 2,560 acres of land; that complainant was his oldest brother and heir; that he had not obtained a warrant or applied for any; and that in 1821, the University of North Carolina obtained the warrant and title to the land descended to complainant, on the supposition that Lieutenant Neal died without heirs, whereby the claim had fallen to the State for want of an owner. This claim we are asked to divest and to transfer the land, and the muniment of title, the warrant, to complainant. The land descended, and the title with it as an incident; the land and the title cannot be separated. It is title the complainant seeks. It is this that confers individual property and secures the right of possession and enjoyment. If the remedy to obtain the title is barred by the act .of limitations, no property can be taken in the *199 land. The title (the warrant) is a hereditament; it is so claimed by this bill and has ever been so holden. Dunlap vs. Gibbs, 4 Yerg. Rep.
The statute of limitations of 1819, declares that no person or his heir shall sue for any lands, tenements, or hereditaments, in law or equity, but within seven years next after his right to sue hath accrued, and within seven years next after the title or cause of action, or suit accrued or fallen to complainant, and at no time after said seven years shall have passed. When had complainant cause of action against the University ? So soon as she obtained the warrant, and against the East Tennessee College, so soon as the warrant was assigned to the latter corporation. This was more than seven years before the suit was brought, wherefore the complainant is barred and the bill must be dismissed.
Green, J.
The only question in this cause is, whether the statute of limitations is a bar to the complainant’s remedy. The warrant was issued by the board of commissioners of North Carolina the 5th day of September, 1821, and passed by the board .of commissioners of Tennessee the 17th day of September, 1822. This bill was filed the 18th day of November, 1828.
It is first insisted by the defendants, that the statute of limitations of three years is a bar to the relief sought. The act of limitations of 1715, ch. 27, sec. 5, has no application in terms to a court of equity. But when a bill is brought for the recovery of any right, the courts of chancery have said, that the time limited to an action at law for the recovery of that right, shall be applied to the case in equity, and bar a recovery. Now this bill is brought to obtain the title to a tract of land, to which the complainants say they have an equitable right. What action at law has any analogy to this bill, the limitation to which, should be applied here? Certainly not the action of trover. Trover might have been brought for the value of *200 the warrant, and would have been barred by the lapse of three years. So if a bill had been filed to obtain the value of the warrant, it would have been barred in the same time. As this bill is not brought for this object, but is brought for the land, it has no analogy to the before mentioned action at law, and consequently there is no pretence for the application of the statute of three years to this case.
We next, come to consider from what period we are to reckon time in the application of the 2d section of the act of 1819, ch. 28. In order to a just understanding of this subject, we must examine into the nature and properties of a land warrant. By the act of 1782, ch. 3, sec. 6, the legislature of North Carolina, in consideration of the “signal bravery and persevering zeal” of the officers and soldiers of the continental line of that State in the revolutionary war, provided, that each soldier should have six hundred and forty acres of land. To the officers a larger quantity was given in proportion to their rank. By this act, each soldier had vested in him an equitable estate to six hundred and forty acres of the unappropriated land of the State of North Carolina, the legal title of which remained in the State, and was held by it in trust for the officers and soldiers, as tenants in common. The right of the soldier to the land, which had been paid for with his services, being in this condition, a warrant issues, directing the surveyor to lay off for the soldier his six hundred and forty acres of land, to which by law he was thus entitled. The warrant does not confer any new right upon the soldier, nor is it of any other value to him, than as merging all other evidences of right; it authorizes the separation of his estate from the balance with which it was before in common. What then is the nature of the warrant before its location? It is not land, but it is the evidence that the party is entitled to the quantity of land it directed to be laid off to him. It is only a muniment of title. If another person than he *201 to whom it issues, get bold of it, and hold that possession more than three years without suit, all remedy tor the warrant, or its value, both at law and equity, is barred.
But is the estate to which the soldier is entitled by virtue of the act of 1782 gone, because he is barred the recovery of his warrant by the lapse of three years? Surely not. The being barred his remedy for the warrant, neither takes away his right to the warrant, or his estate in the land. If the holder cause it to fye located, it being in the name of the true owner, the title of the land vests immediately in such owner, notwithstanding the three years had barred his remedy for the warrant.
The title which was conferred on each soldier by the act of 1782, to the portion of land allotted to him by that act, is, by the issuance of the warrant, rendered more definite and certain. The act provides for each soldier and officer, and the warrant designates the individual to whom it issues as being the soldier or officer for whom the provision is made. It is conclusive upon the State that he is a soldier and is entitled to the land. The warrant becomes his evidence of right, and an assignment of it is a conveyance of the land to which the individual to whom it issues is entitled. If by any improper means a warrant shall have been assigned to an individual not entitled to it, a bill in chancery may be brought by the true owner, and a re-assignment of it enforced. Because as the assignment of the warrant passes the title to the land, a suit in equity may as well be prosecuted to obtain its re-assignment, as to obtain a re-conveyance of granted land, the title of which has been improperly vested in another. In each case it would be a bill for the land; for when the title to the land is obtained, the thing itself is acquired. So soon, therefore, as a warrant shall be vested in any person other than the true owner, by such transfer as will be conclusive, (with those officers of government whose duty it is to do those acts which are necessary to the perfection of the title,) that the person *202 jn whom it is thus vested is entitled thereto, iust so soon has the true owner a right to hie his bill to he re-invested with the title. And if he neglect to do so, for seven years, he will be as effectually barred by the 2d section of the act of 1819, ch. 28, as he would be, if the land were granted to such claimant and the true owner were to delay filing his bill to obtain the title, for more than seven years.
The only difference in the two cases is, that, in the one, the warrant is the evidence of title and the land is held in common, and in the other, the grant is the evidence of title, and the land is set apart and designated by metes and bounds. As the authorities appointed by the laws of North Carolina to issue warrants for the lands to which the soldiers were entitled, did, in consideration of the services of Lieutenant Neal, issue the warrant for those services, to the University of North Carolina, and thereby vested in said University, a title to his land, a right to ‘‘commence this suit” to obtain the title thus improperly vested in the University immediately “accrued” upon the issuance of the warrant, and as no suit was brought by the complainants for more than seven years afterwards, they are barred. I am therefore for affirming the decree.
Peck, J.
The Secretary of North Carolina issued a warrant 5th September, 1821, to the President and Trustees of the University of North Carolina for two thousand five hundred and sixty acres of land, reciting upon its face, that it issued in consideration of the services of William Neal, a soldier in the revolutionary war, who died in the service without heirs; that the same es-cheated, and by an act of assembly, became vested in the University. It is assigned without date to East Tennessee College, and by the board of commissioners of Tennessee, on the 17th September, 1822, passed to the benefit of that institution; entry was made by virtue of it 26th December, 1822, in the western district; the land *203 was surveyed 10th December, 1823; possession was taken shortly after; when the grant issued is not shown.
'The bill was filed the 18th day of November, 1828. The proof is satisfactory that the complainants are the heirs of Neal, the deceased soldier, whose services were the consideration on which the warrant issued. The statute of limitations is relied upon to rebut the claim set up in the bill and to quiet the possession of the College.
In order to settle the question made on the statute of limitations, it is important to fix the character of the title in the different stages of its progress. North Carolina, at ah early date after the revolution, made provision for .paying the soldier in her western lands. The right was held by the State for these meritorious services. The lands set apart, or at least the most of them, were in the possession of the Indians; warrants were issued from time to time as applications were made, but the effect of ‘ vigilance on the part of applicants for warrants, was no other than giving to the first an opportunity of selecting the best land; nothing like a forfeiture by lapse of time or . limitation, so far as the State is concerned, is to be found amongst the statutes of North Carolina. The utmost good faith towards the soldier, to whom the country owed so much, was preserved; for when the lands were ceded, the right was not overlooked, but every precaution used that justice and honor could dictate, that finally all should be satisfied. Tennessee, when at her own solicitation, she became the trustee, in the stead of the parent State, stood pledged to see that this trust on behalf of the Soldier, should be faithfully executed. The evidence of claims were to come from North Carolina, and this evidence it is believed, has been in almost every instance respected. But, notwithstanding every precaution, mistakes would occur; such mistakes however did not change the right; the court of chancery was open, and uniformly lent her aid in giving the right to him, or to the heirs of him who performed the services. True, *204 the interest erven to the University of North Carolina, produced a new class oí cases, not known in our courts until that institution set up her claims to what is called the escheated lands. In order the better to get along with her right, it had to be assumed that the right to a warrant was land, else there would be no escheat; how far the assumption was warranted, it is not now important to inquire; suffice it to say, that in all cases where the University got possession of the warrant, contrary to the fact of the death without heirs of the soldier, she was compelled to restore it or yield the land. True, the soldier had to encounter difficulties. The institution he contended with, was situated near one thousand miles from the land; was a corporation, unfeeling, and relying on strict law and through her agents opposing every obstacle to a recovery. But something is due to the courts, that, consistent with the course of North Carolina, maintained the right, where it was made apparent, and gave to the soldier the reward for his peril.
In this case, to defeat the right, anew ground it is believed is assumed, to wit, that the warrant is land, and that from the time of its issuance the statute of limitations commenced running, and continued until the present complainants are barred. At first blush there is some novelty in the assumption. If the ground assumed can be susiained, would it not be more reasonable to say that a grant is land, although the grantee had never seen or put foot upon the soil described therein? Surely if the warrant was land, that which had exhausted and embodied it by locality' and description, was land also; for in the progress to greater certainty to right and identity, we had not receded from right. This being mathematically true, I would ask where, the mere possession of a grant (not the land described in it) has been held to bar an equity and toll the right? For though the grant gave the seizin, still that seizin, without actual possession of the land under the statute, would not create the bar.
*205 The good sense of every man, it would seem to me, would revolt at the idea that an act which might be done in secret, both as to the taking out the grant and holding it up, should become such a possession as under the statute would bar the right. Our act of 1819 certainly never contemplated such a ease. Nay, the language of one of the Judges, (who now delivers an opinion adverse to this,) has reasoned to show that men understood that land was meant, when a grant was spoken of, rather than a paper title; hear his words: “This was obviously the case with the old settlers, when they spoke of a grant or entry. They did not mean, as legal men of other countries, a paper purporting to be a patent from North Carolina, but they meant the very land itself; i-t meant a specific tract of patented land; and in which conception of the mind the paper by which the land was granted, but remotely and slightly formed an incident.” Martin and Yerger’s Reports, 402.
How is the argument now reversed? The incident is turned into the very land; before, in. the language of the same Judge, “the figure of the land, its surface, and the objects upon it combined,” led the mind.to the actually identified spot. It will be seen in looking to that opinion, that it was only an attempt to amplify the able and leading opinion of Judge Haywood, in the case of Shall vs. Barton, and Waterhouse and Martin.
All our statutes of limitations touching estates in lands, direct the mind to the very object, and the enquiry is to two points; first, the possession, which must be of the land; and second, to the kind of right by which the land specified is held. The warrant does not, so long as it is in fieri, purport to convey the land by description; the pedis possessions cannot apply to a warrant as such; the idea is foreign to the quality of it. What is a warrant? I shall here endeavor to give what I esteem to be a legal definition of it. It is the evidence which the State, on good consideration, gives, that the person therein named *206 is entitled to the quantity of land therein specified, the bounds and description of which the owner of the warrant may fix by entry and survey, in the section of country set apart for its location and satisfaction. This evidence is conclusive upon the State, that she will complete the title by grant. A land warrant is not an incident to the land^ it is not technical to call it so; an incident is that which follows the more worthy or principal.
Let us now see by the act of 1819, ch. 28, how this evidence is affected by time. The possession must be of what? I answer, in the language of the act, “of lands, tenements or hereditaments,” the act does not stop here — “which have been granted by this State or the State of North Carolina, holding or claiming the same by virtue of a deed or deeds of conveyance, devise, grant, or other assurance, purporting to convey an assurance in fee simple; and no suit in law or equity effectually set up or made to said lands tenements or hereditaments within the aforesaid time of seven years, then the person in possession shall be entitled to keep and hold possession of such quantity of land as shall be,” &c. The title to the act, the preamble thereto, and the whole scope and tenor have in view quieting the possession to lands; it looks to the estate, establishes it character, term of duration, “fee simple or less estate,” and names the muniments of title by which it shall be held.
What is there in the act of 1819, that so greatly distinguishes it from the act of 1715, as necessarily to bring within the scope and tenor of the former, the peculiar consideration of land warrants? For myself, I can find no terms that make such a distinction. The act of 1715 uses the terms lands, tenements, and hereditaments in the same connection in which those terms are used in the latter act of 1819; and what Judge ever decided that a land warrant was, under the act of 1715, to be considered as a hereditament, so as with the'possession of the paper *207 alone to be considered barred by the lapse of seven years? I hazard nothing in saying that every lawyer viewed the warrant in another light; and that the act of 1715 had nothing to do with it; nay, at the time of the passage of that act, warrants had not sprung into existence. To quiet titles acquired was the object of both acts. The expressions used prove it.
Land warrants, as our system grew up, were treated as belonging to the heir, or otherwise, just as title bonds were considered, at the will of the holder. An action at law could turn a title bond into money; so too a conversion could be made the means of turning a warrant into money, in an action of trover; though either, in a court of equity, against a wrongful possessor, could be made the means of a specific execution of a contract for the estate. The warrant emanated from the State who held the title for the person having the equitable right. The land emanated from him having the title, who equity would hold responsible for the title. Conduct this investigation fairly; give to our acts of limitations no strained construction to cover a right not legitimately acquired, and there can be found no shadow of pretence for supposing that pre-existing evidence of a right to a title, is the title itself, and therefore barred.
The argument would be vastly stronger to say, that a warrant simply was a naked equity, and for that cause not within the statute. And what gives strength to this position, is the fact, that entries have with most of our judges been so esteemed; though of late, entries have been held to be barred, because admissible in a court of law as evidence of a title sufficient to overreach a grant. If then it has been so difficult to bar by limitations, a specific entry for the land; if our best jurists have all along doubted because of the kind of title, how can limitations apply to that, which, light as the gossamer’s threads, floated with the winds, and falling could not attach any where, until attached by virtue of the recorded entry: *208 if there was so much magic in the term hereditament in the statute, that, contrary to our obvious senses oi sight and touch, the paper for the land has become the land itself, then heir looms are land also. Negroes, in some of the States, are treated in disposing of intestate’s estates as land; this mode of disposition does not change the quality of the thing. Policy has given character for a particular purpose, but that policy has not made the statute, nor can the statute be forced to embrace what is not within the compass of its objects.
Calculate from the entry made by virtue of this warrant and the right is not barred. It is agreed that the limitations of three years cannot apply; three years did not elapse from the time of issuing and the time of entry; and it is only by giving to the unreal witness, first, a body, and then a new name, that it becomes a substance for the statute to operate upon.
The cause of action according to the statute of 1819, commenced when possession was taken of the land; and it cannot be material whether the cause of action be equitable or legal, the effect must be the same, for the action contemplated by the act must lie for the possession of the land: it is the right to this possession that is barred, and the possessor quieted; such is the whole tenor of the act.
I wish to claim to myself none of the patriotism that holds up the worn soldier, as the man of merit above all others. I place his claim beside those of others, whose rights to warrants have grown out of the payment of money. The rights of all shall be with me equal. This is not the place to laud the soldier high in rank; nor is this the place to overlook him, who, in an humbler sphere, did his duty likewise. We should not forget that the servant improving on his two talents should also get his reward.
I regret the necessity of being compelled to enlarge upon a case I cannot but consider a plain one, but the *209 innovation and novelty of a new doctrine attempted to be introduced must plead my justification.
Decree affirmed.